**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Plaintiffs' Counsel on Signature Page]

*Attorneys for Plaintiffs*

KAZEROUNI
LAW GROUP, APC

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATALIE GIANNE and TORI POWELL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DRINK LMNT, INC., and DRINK LMNT DISTRIBUTION, INC.,<br><br>Defendants. | Case No.: 2:26-cv-02029-CAS-BFM<br><br>**CLASS ACTION**<br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1) **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE §§ 1750, *ET SEQ.*;**<br>2) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**<br>3) **VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*;**<br>4) **INTENTIONAL MISREPRESENTATION;**<br>5) **BREACH OF EXPRESS WARRANTY; and**<br>6) **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

### INTRODUCTION

1.    Natalie Gianne ("Ms. Gianne") and Tori Powell ("Ms. Powell") (each a "Plaintiff," and collectively, "Plaintiffs"), individually and on behalf of all other similarly situated consumers, bring this first amended class action complaint ("First Amended Complaint") for damages, injunctive relief, anfd any other available legal or equitable remedies resulting from the unlawful actions of Drink LMNT, Inc. and Drink LMNT Distribution, Inc., doing business as LMNT (collectively, "LMNT"[1] or "Defendants").

2.    This First Amended Complaint concerns the unlawful, unfair, and deceptive labeling, marketing, distribution and sale of LMNT's beverage mix and beverage products, including (a) representations that LMNT's products provide cognitive benefits and (b) representations that the products are "Made in the USA" and/or "Manufactured in the USA," without providing clear and adequate disclosure that they contain foreign ingredients and components, as required by federal and state laws and regulations.

3.    The unlawfully and deceptively represented products are sold through multiple channels, including but not limited to direct-to-consumer sales on Defendants' website, Defendants' Amazon.com ("Amazon") store, and third-party merchants operating both brick-and-mortar retail locations and online storefronts. By way of non-exhaustive example, Defendants' products are also sold through fitness and wellness establishments such as martial arts gyms, CrossFit gyms, fitness centers, sauna facilities, yoga studios, Pilates studios, recovery centers, and wellness spas, as well as through conventional retail outlets including convenience stores, grocery stores and other retailers such as Target, Walmart and Vitamin Shoppe.

4.    Plaintiffs, who purchased certain varieties of Defendants' products (the "Products"),[2] allege the following upon personal knowledge as to their own acts and

---

[1] Upon information and belief, "LMNT" is pronounced as "element."
[2] *See infra* ¶¶ 11, 142, 144, 148-49.

experiences, and upon information and belief as to all other matters, based on the investigation conducted by their attorneys.

5.    In the highly competitive consumer product and beverage industry, some companies seek to gain an unfair advantage by misleading consumers about their products. Defendants market their products as providing cognitive benefits. In truth, the products contain no ingredients capable of delivering such benefits, and certainly no ingredients that alleviate "brain fog," or provide "focus" as those terms are commonly understood by reasonable consumers. As a result, Defendants' marketing is false, deceptive, misleading, and fraudulent, and consumers are harmed by paying a premium price for products that do not perform as represented.

6.    Numerous federal and state laws, rules, and regulations govern the labeling of consumer products, including products such as LMNT's.

7.    For example, the Federal Food, Drug, and Cosmetic Act ("FDCA"), and various state laws[3] that generally align with the FDCA govern the aspects of food and beverage labeling discussed herein. These laws reflect a fundamental principle: consumers have the right to know what they are purchasing.

8.    When companies misrepresent the benefits of their products, mischaracterize the nature of their formulations, or falsely claim their origin, they violate fundamental consumer protection laws. Such misconduct undermines consumer trust, distorts the marketplace, and grants an unfair competitive advantage.

9.    Under both the FDCA and California law, a food product[4] is considered misbranded if its labeling is false or misleading in *any particular*.[5]

10.    Additionally, Defendants' products are labeled as "Manufactured in the USA," or "Made in the USA" (or a synonymous U.S. origin claim), without any qualification, despite containing foreign ingredients and/or components. This

---

[3] *See* Cal. Health & Safety Code §§ 110660, 110760, 110765.
[4] LMNT's products are considered "food products" under applicable laws.
[5] *See* 21 USC § 343(a) and Cal. Health & Safety Code § 110660.

practice violates federal and state regulations that require clear and adequate qualification of the foreign ingredients and components used in a product when U.S. origin claims are made.

11.    LMNT's zero sugar electrolyte drink mix products purchased by Plaintiffs were falsely represented as providing cognitive benefits, namely alleviating "brain fog," and being "Manufactured in the USA," or "Made in the USA,"[6] despite containing numerous foreign ingredients and components. These representations are demonstrably false, as detailed further herein.

12.    As stated by the California Supreme Court in *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011):

> **Simply stated: labels matter.** The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source. . .In particular . . . **the "Made in U.S.A." label matters**. A range of motivations may fuel this preference, from desire to support domestic jobs or labor conditions, to simply patriotism. The Legislature has recognized the materiality of this representation by specifically outlawing deceptive and fraudulent "Made in America" representations. (Cal. Bus & Prof. Code section 17533.7; see also Cal. Civ. Code § 1770, subd. (a)(4) (prohibiting deceptive representations of geographic origin)). The objective of section 17533.7 "is to protect consumers from being misled when they purchase products in the belief that they are advancing the interest of the United States and the industries and workers. . ." (emphasis added).

13.    Defendants market, advertise, and sell their products through express representations that they provide cognitive benefits, including relief from or

---

[6] For purposes of this First Amended Complaint, the term "Made in the USA" shall be understood to encompass all synonymous phrases and representations.

improvement of "brain fog" - even though the Products contain no clinically proven nootropic [7] ingredients capable of producing such effects. This representation appears uniformly across Defendants' marketing and advertising materials for all products sold through its Amazon store, including the specific Products purchased by Plaintiff Gianne through Amazon.

14.    Upon information and belief, Defendants have also advertised and/or marketed the Class Products as providing cognitive benefits through additional channels beyond Amazon, including but not limited to blogs, email newsletters, social media platforms, public relations driven press or media coverage, and podcast advertising. The full scope, content, and dissemination of Defendants' cognitive benefit marketing are within the exclusive knowledge, control, and possession of Defendants and their agents, and therefore cannot be fully ascertained or pleaded without the benefit of discovery.

15.    All of Defendants' products are labeled and marketed with representations that they are "Made in the USA" and/or "Manufactured in the USA," without any qualification or disclosure of foreign ingredients or components used therein. These claims appear on the products themselves and in the accompanying marketing materials, including those related to the Products purchased by Plaintiffs.

16.    Defendants' conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentations violates: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*.; (3) California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, *et*

---

[7]    *See*    https://www.psychologytoday.com/us/basics/nootropics    ("Nootropics (pronounced noo-traah-puhks) are compounds or supplements that enhance cognitive performance.") (Unless otherwise stated, all websites cited in this First Amended Complaint were last visited on February 19, 2026)

*seq.*; and constitutes (4) intentional misrepresentation (5) breach of express warranty and (6) unjust enrichment.

17.     Additionally, Defendants' conduct of labeling, marketing and selling deceptively labeled products bearing the representation that such products are "Made in the USA" and/or "Manufactured in the USA" without qualification also violates the FDCA, 16 C.F.R. § 323 (Federal Trade Commission 2021) (the "MUSA Rule"), and California laws, including Section 17533.7 of the California Business and Professions Code (the "CA MUSA Rule").

18.     This conduct caused Plaintiffs, and other similarly situated consumers, damages, and requires restitution and injunctive relief to remedy and prevent future harm.

19.     In addition to the false and misleading claims regarding the specific Products purchased by Plaintiffs, LMNT's other products, including, but not limited to, those identified in **Exhibit A** and featured on LMNT's website (the "Class Products"), are likewise labeled and/or marketed with the same deceptive representations, including their cognitive benefit claims and unqualified claims that they are "Made in the USA" and/or "Manufactured in the USA," and are subject to this lawsuit.

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity as Plaintiffs are citizens of the State of California, Drink LMNT Inc. is a Delaware corporation with its principal place of business in Florida,[8] and Drink LMNT Distribution, Inc. is a Delaware corporation with its principal place of business in

---

[8] According to Defendant Drink LMNT, Inc.'s most recent filing with the Montana Secretary of State, dated January 8, 2026, Drink LMNT's "Business Mailing Address of Principal Office" is listed in Montana, while its "Business Physical Address of Principal Office" is listed in Florida.

Montana[9]; (2) the amount in controversy in this matter exceeds $5 million,[10] exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative class.

21.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff Gianne resides in Los Angeles County, California, and purchased one of the Products in-person at a retail location in Santa Monica, California, which is within this judicial district; (ii) a substantial part of the conduct complained of herein occurred within this judicial district; and (iii) Defendants conducted business within this judicial district at all relevant times.

## PARTIES

22.    Plaintiff Gianne is, and at all times mentioned herein was, a natural person, an individual citizen and resident of Los Angeles County, California.

23.    Plaintiff Powell is, and at all times mentioned herein was, a natural person, an individual citizen and resident of San Diego County, California.

24.    Defendant Drink LMNT, Inc. is an entity incorporated under the laws of the State of Delaware, with its principal place of business at 1150 Central Avenue, Naples, Florida 34102.

25.    Defendant Drink LMNT Distribution, Inc. is an entity incorporated under the laws of the State of Delaware, with its principal place of business at 1925 Grand Avenue # 62539, Suite 129, Billings, Montana 59102.

26.    Defendant Drink LMNT, Inc. is a formulator, marketer and seller of beverage and beverage mix products that conducts business: (a) direct-to-consumer through its website and its Amazon store; (b) through the websites of third-party vendors, including, but not limited to, Walmart.com, Target.com, Thrivemarket.com, and

---

[9] According to Defendant Drink LMNT Distribution, Inc.'s most recent filing with the Montana Secretary of State on January 8, 2026.

[10] *See infra* ¶¶ 33-35.

Vitaminshoppe.com; and (c) distributes its products to be sold in brick-and-mortar stores including, but not limited to, grocery stores, convenience stores, specialty pharmacies, martial arts gyms, CrossFit gyms, fitness centers, sauna facilities, yoga studios, Pilates studios, recovery centers, wellness spas, and elsewhere.

27.    Defendant Drink LMNT Distribution, Inc. is owned by Defendant Drink LMNT, Inc. and is the direct store delivery company formed to sell and distribute beverage and beverage mix products for Defendant Drink LMNT, Inc.

28.    Plaintiffs allege that, at all relevant times, Defendants conducted business within Los Angeles County, California, and within this judicial district.

29.    Unless otherwise indicated, the use of each of the Defendants' names in this First Amended Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendants, respectively.

### NATURE OF THE CASE

30.    Defendant Drink LMNT, Inc. was founded in 2018 and has since grown into one of the leading, if not *the* leading, electrolyte drink mix and beverage companies in the United States.

31.    Defendants together market and sell a portfolio of products through multiple distribution channels including, but not limited to, their own website,[11] their Amazon store,[12] through third-party retailers online as well as in brick-and-mortar stores.

32.    Upon information and belief, Defendants currently generate annual revenues

---

[11] *See* https://drinklmnt.com/.

[12] *See* https://www.amazon.com/stores/DrinkLMNT/page/31239BC7-7D8A-4284-9D9D-B2E45B4AEA4A?is_byline_deeplink=true&deeplink=33714DB5-2F7E-4FA6-AAC6-E54EA1DB8EA9&redirect_store_id=31239BC7-7D8A-4284-9D9D-B2E45B4AEA4A&lp_asin=B07TT8B1JJ&ref_=ast_bln&store_ref=bl_ast_dp_brandLogo_sto

in the hundreds of millions of dollars.

33.    According to Defendant Drink LMNT, Inc.'s publicly available filings with the U.S. Securities and Exchange Commission ("SEC"), including its Form C-AR filed pursuant to Regulation Crowdfunding, Drink LMNT, Inc. raised capital through a crowdfunding offering conducted under the Securities Act of 1933. Pursuant to its ongoing disclosure obligations, Drink LMNT, Inc. made annual filings reporting its financial condition, operations, and revenue until at least April 18, 2024.

34.    These filings, which are available on the SEC's EDGAR database (https://www.sec.gov/edgar/browse/?CIK=1871551), include detailed information regarding Drink LMNT, Inc.'s reported revenues and business activities for fiscal years 2021, 2022, and 2023. According to these records, Defendants reported revenue of approximately $7,053,000 for the fiscal period ending December 31, 2021; $31,589,000 for the period ending December 31, 2022; $78,714,000 for the period ending December 31, 2022; and $206,270,000 for the period ending December 31, 2023. Upon information and belief, Drink LMNT, Inc.'s revenues have continued to exceed hundreds of millions of dollars in 2024 and 2025.

35.    While Drink LMNT, Inc.'s Form C-AR for 2023 lists "206270.00" as "Revenue/Sales Most Recent Fiscal Year-end," it appears the figures are expressed in thousands (i.e., millions of dollars), as the prior year's revenue of "78714.00" corresponds to its 2022 reported revenue of $78,714,000.

36.    As a result of their commercial success, Defendants possess financial and professional resources that far exceed those available to typical emerging or startup consumer product companies.

37.    Given Defendants' substantial resources and operational sophistication, it is difficult to conceive how Defendants could so blatantly disregard the well-established laws, rules, and regulations governing the labeling, marketing, and sale of beverages and beverage mix products.

38.    At all relevant times, Defendants, and their agents, made and continue to make material misrepresentations regarding the Class Products.

39.    Defendants together advertise, market, promote, distribute and sell the Class Products as providing cognitive benefits such as alleviation of "brain fog" and "sustained focus" when, in reality, they contain no clinically proven ingredients, or combination of ingredients, capable of producing such cognitive or nootropic effects. Defendants also advertise, market, promote, distribute and sell the Class Products as "Made in the USA" and/or "Manufactured in the USA," without disclosing that they contain foreign-sourced ingredients, including key components. These representations are false, unlawful, unfair, and deceptive, and, upon information and belief, continue to be made by Defendants and/or their agents.

40.    Each consumer, including Plaintiffs, was exposed to the same material misrepresentations, as virtually identical labels, packaging, and marketing materials were used in the promotion and sale of all Class Products nationwide, including within the State of California.

41.    Federal and state laws, rules, and regulations governing the truthful and accurate marketing and labeling of consumer products are well-established and clearly defined. Specifically, under the FDCA, a product is considered *misbranded* if its labeling is false or misleading in any particular. 21 U.S.C. § 321(m) states that the term "labeling" encompasses not only labels on the product or its container, but also *all written, printed, or graphic matter that accompanies the product*, including promotional brochures, advertising copies, and marketing materials, thereby bringing Defendants' marketing claims within the scope of the statute.

42.    Additionally, federal and state laws and regulations regarding the use of "Made in the United States" claims, including any synonymous claims, whether express or implied, are well-established and clearly defined with respect to products and services as discussed herein.

43.    As a direct result of Defendants' unfair and deceptive practices, Plaintiffs and

other similarly situated consumers purchased the Class Products based on false impressions and in reasonable reliance on Defendants' misrepresentations.

44.    As a result, Plaintiffs and other similarly situated consumers overpaid for the Class Products, purchased the Class Products over the products of competitors, and/or purchased the Class Products under the belief that the Defendants' representations were accurate, truthful and lawful. This includes initial and repeat purchases of the Class Products.

45.    Despite clearly established and well-defined federal and state laws, rules, and regulations, including consumer protection laws, governing the labeling, marketing, and sale of products such as the Class Products in the United States, Defendants falsely, unfairly, and deceptively advertise, market, and sell their products, including the Products purchased by Plaintiffs, as further detailed herein.

46.    Had Plaintiffs and other similarly situated consumers been aware that the labeling and marketing of the Class Products contained false, unfair and deceptive misrepresentations, they would not have purchased the Class Products or would have paid less for them.

47.    As a result of Defendants' false, unfair, and deceptive statements and/or their failure to disclose the true contents of the Class Products, along with the other conduct described herein, Plaintiffs and similarly situated consumers purchased hundreds of thousands of units of the Class Products across the United States, including in California, and have suffered, and continue to suffer, harm, including the loss of money and/or property.

48.    Defendants' conduct regarding the labeling, marketing, distribution and sale of the Class Products, as alleged herein, violates multiple federal and California laws, rules, and regulations, as detailed below.

49.    This action seeks, among other things, equitable and injunctive relief; public injunctive relief; restitution of all amounts unlawfully retained by Defendants; and disgorgement of all ill-gotten profits resulting from Defendants' alleged

wrongdoing.

50.    Unless enjoined, Defendants' unfair, deceptive and unlawful conduct will continue into the future, and Plaintiffs and Class members will continue to suffer harm.

**FACTUAL ALLEGATIONS**

51.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

52.    At all relevant times, including as of the filing of this First Amended Complaint, Defendants and/or their agents have made material misrepresentations regarding the Class Products.

### A.    False Cognitive Function Claims

53.    Defendants market, advertise, distribute and sell their products, including the Products purchased by Plaintiff Gianne, as providing cognitive benefits such as alleviation of "brain fog" and boosting "sustained focus."

54.     Consumers are increasingly drawn to products marketed as supporting cognitive health or "brain function" because they associate such claims with improved mental clarity, productivity, and long-term neurological wellbeing. The promise of reducing "brain fog," boosting "sustained focus," or enhancing cognitive function in any way is often perceived as a marker of a higher-quality, more effective, or scientifically advanced product. In an age where performance and wellness converge, cognitive-benefit claims carry significant weight in consumers' minds, influence purchasing decisions, and can command premium pricing in the marketplace.

55.    The nootropics market (which includes cognitive supplements, beverages, and ingredients marketed for "brain health") has experienced dramatic growth: forecasts estimate the global nootropics market will expand from approximately $4.98 billion in 2024 to over $19.53 billion by 2034, at a compound annual growth

rate of 14.64 %.[13] In the U.S., the nootropics industry is similarly booming, driven by consumer demand for functional products that purport to support focus, memory, or mental energy.[14]

56.    Because of this, companies can achieve outsized profits by marketing products with cognitive claims, even absent scientific backing. Representations of "brain fog" relief or "sustained focus" are powerful marketing tools because they appeal to consumers' aspirations for better mental performance, lend a scientific or wellness halo to otherwise ordinary products, and lead consumers to pay a premium or choose these products over competing options that do not make similar representations.

57.    Consumers, including Plaintiff Gianne, have sought out products marketed with claims of supporting cognitive health and function due to both the actual and perceived benefits associated with improved focus, mental clarity, and overall brain performance.

58.    As a result, cognitive health claims have become a critical factor in purchasing decisions, driving consumers to favor dietary supplement, food and beverage products that prominently feature cognitive health representations over those that do not.

59.    Recognizing this consumer demand, Defendants deliberately sought to capitalize on it by prominently marketing, advertising, and representing the Class Products with bold and conspicuous cognitive-benefit claims, such as representations of "brain fog" alleviation and "sustained focus," in order to exploit consumers' awareness of, and preference for, products that purport to enhance mental clarity, focus, and overall cognitive performance.

60.    A reasonable consumer expects that when a product is expressly marketed as

---

[13] *See* https://www.towardshealthcare.com/insights/nootropics-market-sizing.
[14]    *See*    https://www.grandviewresearch.com/industry-analysis/us-nootropics-market-report

providing cognitive benefits, such as "brain fog" relief or "sustained focus," it in fact contains ingredients, or a combination of ingredients, capable of producing those effects, consistent with the plain meaning of such representations and as those terms are commonly understood by reasonable consumers.

61.    In the case of the Class Products, Defendants have prominently featured cognitive benefit representations, including claims of "brain fog" alleviation and "sustained focus," in their marketing and advertising materials. These representations have been, and continue to be, repeated and disseminated by Defendants.

62.    Below are non-exhaustive examples of the aforementioned representations appearing in the marketing of the Class Products.



1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





63.    Defendants' false and misleading cognitive-benefit representations were intentionally designed to mislead consumers into believing that the Class Products provided meaningful improvements to brain function, including relief from "brain fog" and enhanced focus. These claims exploited consumer trust in product marketing and materially influenced purchasing decisions by suggesting the Class Products contained effective, science-backed nootropic ingredients. In truth, however, the Class Products contain no clinically proven ingredients, or combination of ingredients, capable of producing such cognitive benefits.

64.    Defendants knew, or in the exercise of reasonable care should know, that their cognitive-benefit representations are false, misleading, and unsubstantiated. Despite the absence of competent and reliable scientific evidence demonstrating that the Class Products, or any of their ingredients, provide the advertised cognitive or nootropic effects, Defendants continue to make and disseminate these claims in order to maximize sales and gain an unfair competitive advantage.

Impermissible Claims for Conventional Foods

65.   Under federal law, products labeled with a Nutrition Facts panel, such as the Class Products, are considered conventional foods, not dietary supplements. The FDCA and United States Food and Drug Administration ("FDA") regulations impose distinct and more restrictive rules on health, and structure/function claims for conventional foods. Unlike dietary supplements, conventional foods *cannot* lawfully make structure/function or health claims that are not directly related to the product's nutritive value or that imply therapeutic or disease-related benefits.[15]

66.   Under FDA guidance, a "health claim" characterizes a relationship between a food substance and a disease or health-related condition and may appear on food labeling only if specifically authorized by the FDA through *pre-market review* and *approval*. Defendants have not sought or obtained any such FDA review, authorization or approval for the cognitive-benefit representations made in connection with the Class Products.[16]

67.   The FDA distinguishes lawful nutritional content statements (e.g., "contains B-vitamins, which help convert food to energy") from unlawful therapeutic or performance-related claims (e.g., "improves memory," "sharpens focus," or "relieves brain fog") that imply disease-level or non-nutritive effects. Such claims are prohibited on foods because they either constitute unapproved health claims or impermissible drug claims.[17]

68.   California's consumer-protection statutes incorporate these same principles. The UCL, FAL, and CLRA each prohibit the marketing of products using false or misleading representations that would deceive a reasonable consumer. A business practice that violates the FDCA or its implementing regulations likewise constitutes an "unlawful" practice under the UCL and other applicable statutes.

---

[15] *Compare* 21 U.S.C. §§ 321(f), 343(a)(1), 343(r) *with* 21 C.F.R. § 101.93(f).

[16] *See* 21 C.F.R. § 101.70; *see also* 21 C.F.R. §§ 101.72–101.83

[17] *See* https://www.fda.gov/food/nutrition-food-labeling-and-critical-foods/label-claims-conventional-foods-and-dietary-supplements

69.     Accordingly, to the extent Defendants' Class Products bear a Nutrition Facts panel and are marketed as providing "focus," "brain fog," or other cognitive benefits, such claims are impermissible and deceptive under both federal and California law because they are (1) not substantiated by competent and reliable scientific evidence, (2) not authorized as lawful structure/function or health claims for foods, and (3) likely to mislead reasonable consumers regarding the Products' nature, composition, and efficacy.

<u>Cognitive Claims Unsubstantiated Even if Classified as Supplements</u>

70.     Even if Defendants' Class Products were classified as dietary supplements rather than conventional foods, Defendants' cognitive-benefit representations would still be false and misleading. The Class Products lack ingredients that are generally recognized, or supported by competent and reliable scientific evidence, to improve "focus," alleviate "brain fog," or otherwise provide direct cognitive benefits, and therefore remain unsubstantiated and deceptive under both federal and California law.

71.     The FDA requires that all statements made for dietary supplements, including structure/function claims, be truthful, not misleading, and substantiated by competent and reliable scientific evidence. According to the FDA's Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act[18], manufacturers must possess adequate scientific support for each claimed benefit before dissemination. Such substantiation generally demands well-controlled human clinical studies, consistent with the totality of publicly available evidence, demonstrating that the supplement or its ingredients produce the represented physiological or functional effects.

---

[18]     *See*     https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food

72.     Defendants lack competent and reliable scientific evidence meeting this FDA standard. No well-controlled human clinical studies demonstrate that the ingredients in the Class Products, alone or in combination, produce any measurable improvement in cognitive performance, focus, or mental clarity. Defendants' marketing instead relies on anecdotes, and unsupported extrapolations, none of which satisfy the evidentiary threshold required to substantiate dietary supplement claims under federal law.

73.     The Class Products, including those purchased by Plaintiffs, contain the same core ingredients, differing only in flavor profile. As represented on the Class Products' labeling, the ingredients, listed in descending order by predominance,[19] are salt (sodium chloride), malic or citric acid, magnesium malate, potassium chloride, natural flavors, and stevia leaf extract. One variant, marketed as the "Raw Unflavored" product, omits malic and/or citric acid, natural flavors, and stevia leaf extract.

74.     None of these ingredients are recognized by the scientific or regulatory community, whether individually or in combination, as capable of improving cognition, enhancing "focus," or alleviating "brain fog" as that term is commonly understood by reasonable consumers. Salt, magnesium malate, and potassium chloride function primarily as electrolytes that support hydration and taste, not cognitive performance. Malic acid, citric acid, natural flavors, and stevia leaf extract serve flavoring, sweetening, and in some instances, may also serve a preservative role. Accordingly, nothing in the Class Products' formulation could reasonably be expected to deliver the cognitive effects Defendants represent to consumers.

75.     Compounds commonly described in the scientific literature as "nootropics" are generally understood to fall into recognized categories based on their chemical nature and their demonstrated physiological effects. These categories include,

---

[19] Federal regulations require that ingredients in a food product be listed on the label in descending order of predominance by weight. *See* 21 C.F.R. § 101.4(a).

among others: (a) classical nootropic compounds, typically synthetic substances or pharmacologic agents developed to directly affect cognitive function; (b) substances that increase brain metabolism or cerebral blood flow and are associated with demonstrated neurophysiological effects; (c) cholinergic substances, including acetylcholine precursors or related compounds that act on cholinergic pathways implicated in cognition; and (d) certain plants or plant-derived extracts that have been studied for potential cognitive effects based on identifiable bioactive constituents.[20] Across these categories, substances characterized as nootropics are distinguished by their mechanism of action, their recognized role in cognitive processes, and the existence of scientific evidence supporting their claimed effects.

76.    The ingredients in the Class Products do not fall within any recognized class of substances described in scientific literature as nootropics. None of the Class Products' ingredients are classified as classical nootropic compounds, substances known to increase brain metabolism or cerebral blood flow, cholinergic agents, or plant-derived compounds with recognized cognitive activity. As a result, the Class Products' formulation bears no relationship to the categories of substances commonly associated with cognitive enhancement or nootropic effects.

77.    Defendants' cognitive-benefit marketing exploits consumer familiarity with the concept of nootropics and other substances commonly associated with mental performance, focus, and clarity, while omitting the material fact that the Class Products contain none of the types of ingredients recognized as capable of producing such effects. Reasonable consumers understand claims related to cognition, focus, or mental energy to signal the presence of ingredients capable of providing cognitive-enhancement. By making express cognitive representations without disclosing that the Class Products fall entirely outside of recognized categories of cognitive-enhancing ingredients, Defendants create a misleading net

---

[20] *See* Malík, M. & Tlustoš, P., *Nootropics as Cognitive Enhancers: Types, Dosage and Side Effects of Smart Drugs*, 14 NUTRIENTS 3367 (2022).

impression that the products possess attributes they do not have.

78.    Even if that magnesium or potassium intake could have some attenuated or indirect relationship to cognitive performance, neither nutrient is present in the Class Products in functionally meaningful amounts. Defendants' own Nutrition Facts labeling confirms the implausibility of any claimed cognitive effects and contradicts the net impression created by Defendants' marketing.

79.    Per serving, the Class Products provide only 60 milligrams of magnesium, representing 15 percent of the Daily Value, and just 200 milligrams of potassium, representing 4 percent of the Daily Value.[21] These amounts constitute minor nutritional contributions, not full or performance-relevant daily doses of either nutrient, and are insufficient to produce any meaningful cognitive effects, even assuming *arguendo* that such effects could be associated with either nutrient. The minimal Daily Value percentages disclosed on the label underscore that the Class Products are formulated for basic electrolyte replenishment rather than mental performance, and further demonstrate that Defendants' cognitive benefit representations are misleading when viewed in light of the products' actual composition.

80.    Salt, which is the primary ingredient in the Class Products, likewise cannot plausibly support Defendants' cognitive or energy representations. A general review of the scientific literature, including observational human studies as well as animal research, reflects associations between increased sodium intake and adverse cognitive outcomes or cognitive impairment, while no credible body of scientific evidence demonstrates that sodium consumption confers cognitive benefits,

---

[21] The Daily Value ("DV") is a reference amount established by federal authorities to indicate the recommended total daily intake of a nutrient for purposes of nutrition labeling. For adults and children four years of age and older, the DV is 420 milligrams per day for magnesium and 4,700 milligrams per day for potassium. *See* Office of Dietary Supplements, National Institutes of Health, Daily Values, https://ods.od.nih.gov/HealthInformation/dailyvalues.aspx#.

enhances focus, or alleviates "brain fog."[22] Thus, even setting aside the insufficiency of the Class Products' other ingredients, the prominence of salt in the formulation further underscores the implausibility and deceptiveness of Defendants' cognitive benefit claims.

81.    Any suggestion by Defendants that the Class Products' high sodium content could plausibly support cognitive benefits by addressing sodium insufficiency is

---

[22] *See* Giuseppe Faraco *et al.*, *Dietary Salt Promotes Cognitive Impairment Through Tau Phosphorylation*, 574 NATURE 686 (2019) ("These findings identify a causal link between dietary salt, endothelial dysfunction and tau pathology, independent of haemodynamic insufficiency. Avoidance of excessive salt intake and maintenance of vascular health may help to stave off the vascular and neurodegenerative pathologies that underlie dementia in the elderly.");

Giuseppe Faraco *et al.*, *Dietary Salt Promotes Neurovascular and Cognitive Dysfunction Through a Gut-Initiated TH17 Response*, 21 NAT. NEUROSCI. 240 (2018) ("A diet rich in salt is linked to an increased risk of cerebrovascular diseases and dementia, but it remains unclear how dietary salt harms the brain.");

Fang Sun *et al.*, *The Impact of Salt Consumption on Cardiometabolic and Cognitive Health in Aged Female Rats*, 14 SCI. REP. 25363 (2024) ("Salt is a common component of modern diets globally. The average global dietary salt intake is 12 g per day, approximately 2.5 times the recommended 5 g daily. Excessive dietary salt intake has been associated with hypertension and increased risk of cardiovascular disease and cognitive impairment.");

Weike Liu *et al.*, *Excessive Dietary Salt Intake Exacerbates Cognitive Impairment Progression and Increases Dementia Risk in Older Adults*, 24 J. AM. MED. DIR. ASS'N 125 (2023) ("Excessive dietary salt impairs cognitive function and increases cognitive impairment risk in older adults independently of known risk factors, including hypertension and APOE genotype.");

Monica M. Santisteban & Costantino Iadecola, *Hypertension, Dietary Salt and Cognitive Impairment*, 38 J. CEREBRAL BLOOD FLOW & METABOLISM 2112 (2018) ("Recent evidence indicates that high dietary salt may also induce cognitive impairment. Contrary to previous belief, the effect is not necessarily associated with hypertension and is mediated by a deficit in endothelial nitric oxide.").

inconsistent with prevailing dietary conditions in the United States. Sodium consumption among the general population is widely understood to be abundant, and frequently excessive, as reflected in dietary patterns shaped by processed and packaged foods.[23] In this context, the addition of substantial sodium through the Class Products does not reasonably correspond to a cognitive or energy benefit for ordinary consumers, and instead further underscores the disconnect between Defendants' marketing representations and the nutritional realities of the products as formulated.

82.    Accordingly, Defendants' marketing of the Class Products as providing "focus," alleviating "brain fog," or delivering other cognitive benefits, while

---

[23] *See* Ahmed M., Ng A.P., Christoforou A., Mulligan C. & L'Abbé M.R., *Top Sodium Food Sources in the American Diet - Using National Health and Nutrition Examination Survey*, 15 NUTRIENTS 831 (2023) ("Nearly 90% of Americans consume sodium at levels which exceed amounts recommended by the 2015–2020 Dietary Guidelines for Americans.").

Centers for Disease Control & Prevention, *Get the Facts: Sodium and the Dietary Guidelines* (Oct. 2017) ("The 2015-2020 Dietary Guidelines for Americans recommend that Americans consume less than 2,300 milligrams (mg) of sodium per day as part of a healthy eating pattern. Based on these guidelines, the vast majority of adults eat more sodium than they should – an average of more than 3,400 mg each day.");

U.S. Food & Drug Administration, *Sodium in Your Diet: Use the Nutrition Facts Label and Reduce Your Intake* (last updated Mar. 5, 2024), https://www.fda.gov/food/nutrition-education-resources-materials/sodium-your-diet ("The food supply contains too much sodium and Americans who want to consume less sodium can have a difficult time doing so.");

American Medical Association, *What Doctors Wish Patients Knew About Sodium Consumption* (Aug. 15, 2025), https://www.ama-assn.org/public-health/prevention-wellness/what-doctors-wish-patients-knew-about-sodium-consumption ("'The average American consumes about 3,400 milligrams of sodium a day, which is a lot,' said Dr. Morton. 'This is compared to the recommended amount of 2,300 milligrams.' What is alarming is that 'many may not realize they consume too much sodium,' Dr. Egan said.").

---

knowingly formulating them without any scientifically recognized nootropic ingredients, is false, deceptive, and misleading to reasonable consumers. The absence of such ingredients directly contradicts Defendants' express cognitive claims and violates consumer trust, federal and California law, and applicable regulatory standards.

83. Upon information and belief, in addition to misleading consumers such as Plaintiff Gianne, Defendants' false cognitive claims have also misled influencers, advertisers, and marketing partners, who in turn promoted the Class Products using the same deceptive representations, thereby amplifying and perpetuating Defendants' false advertising. This chain of deception, initiated and maintained by Defendant, continues to this day.

84. Upon information and belief, journalists, product reviewers, and other media outlets were likewise misled by Defendants' false and deceptive labeling, thereby contributing to the widespread public dissemination of Defendants' false narrative regarding the Class Products' purported cognitive benefits.

85. As a result of Defendants' false cognitive-benefit claims, the Class Products have obtained an unfair competitive advantage across digital marketing channels, including social media platforms, search engine algorithms, online retail marketplaces such as Amazon, and even word of mouth. Defendants' deceptive representations artificially inflated consumer demand, boosted search visibility, and diverted sales from competing products that did not employ false or misleading advertising.

86. This deceptive marketplace positioning has harmed both consumers and honest competitors operating in the same market, including competing electrolyte products such as Liquid I.V.,[24] Nuun,[25] and others. By falsely representing the Class Products as offering cognitive benefits, Defendants unfairly diverted consumer

---

[24] *See* https://www.liquid-iv.com

[25] *See* https://nuunlife.com/

attention and sales from competitors that market their products truthfully and in compliance with applicable law.

87.    The full scope and impact of this deceptive marketing are uniquely within Defendants' possession and control, including records maintained by third-party marketing agents and platforms acting on their behalf. Accordingly, Plaintiffs cannot ascertain or allege the complete extent of Defendants' misrepresentations without the benefit of discovery.

88.    Defendants possess superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

89.    Defendants' false and deceptive cognitive benefit claims misled consumers into purchasing products that failed to meet their reasonable expectations. This deception resulted in financial harm and eroded trust in product marketing. As a consequence, consumers, including Plaintiff Gianne, did not receive the cognitive supporting products they believed they were purchasing, nor did they receive the benefits associated with such representations. Instead, they paid a premium for a product that failed to deliver the promised cognitive benefits.

90.    Upon information and belief, Defendants either charged a premium for the Class Products compared to their competitors or gained a significant competitive advantage by misleading consumers into choosing their products over others based on false "focus," "brain fog," and other cognitive benefits claims. Federal and California laws are specifically designed to protect consumers from such false, deceptive, misleading, and unlawful representations, as well as from predatory business practices that unfairly manipulate consumer choice.

**B.    False U.S. Origin Claims**

91.    Defendants produce, market, advertise, distribute and sell the Class Products, including the Products purchased by Plaintiffs, as "Made in the USA" and/or "Manufactured in the USA," without clear and adequate qualification.

92.    The MUSA Rule clearly defines the meaning of "Made in the United States"

or any synonymous representations[26] and outlines when such designations may be used without qualification. Specifically, clear and adequate qualifications must notify consumers if the good or service contains or is made with ingredients or components that are not made or sourced in the United States.[27]

93.    California Business and Professions Code § 17533.7 generally parallels the federal "Made in USA" standard by prohibiting the sale or advertisement of any product labeled or represented as "Made in the United States" when the product or any of its components has been entirely or substantially made, manufactured, or produced outside the United States. The statute thus incorporates the same consumer-protection principles underlying the federal MUSA Rule, ensuring that such origin claims are truthful, not misleading, and adequately qualified where foreign-sourced materials are used.

94.    Despite the clearly established and well-defined federal and state laws and regulations, including consumer protection laws, regarding U.S. origin claims, Defendants falsely, unfairly and deceptively advertise, market and sell the Class Products, including the Products purchased by Plaintiffs, as "Made in the USA"

---

[26] *See* 16 C.F.R. § 323.1(a) ("**The term Made in the United States means any unqualified representation,** express or implied, **that a product or service**, or a specified component thereof, **is of U.S. origin**, **including**, but not limited to, a representation that such product or service is "**made**," "**manufactured**," "built," "produced," "created," or "crafted" **in the United States** or in America, or any other unqualified U.S.-origin claim.") (emphasis added).

[27] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, **it is an unfair or deceptive act or practice** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), **to label any product as Made in the United States unless** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, **_and_ all or virtually all ingredients or components of the product are made and sourced in the United States**. (emphasis added).

and/or "Manufactured in the USA," without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further discussed herein.

95.    Despite their unqualified "Made in the USA" representations, the Class Products are made using numerous ingredients and components that are neither domestically grown, sourced, nor produced.

96.    For the Class Products, Defendants' unqualified U.S. origin claim appears on product labeling and packaging in contrasting text stating "Made in the USA," and/or "Manufactured in the USA," and is set apart from surrounding wording, thereby reinforcing the message that the Class Products and their ingredients are of U.S. origin. The same unqualified claim also appears in Defendants' marketing and advertising for the Class Products, including on third-party reseller websites. In some instances, the "Made in the USA" text is accompanied by prominent iconography of the American flag, further amplifying the U.S. origin message conveyed to consumers.

97.    Below are non-exhaustive examples of the aforementioned representation regarding the Class Products:










1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28








1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





98.   Defendants' unqualified U.S. origin representations are prominently and consistently displayed in the same location on the packaging of each type of Class Product.

99.   As a result of the "Made in the USA" and "Manufactured in the USA" representations on the Class Products' packaging and in their advertising, online retailers have further propagated this misrepresentation through their websites' product pictures and descriptions, in addition to continuing to sell the Class Products with unqualified "Made in the USA" (or similar) misrepresentations on their shelves, where applicable.[28]

100.   As a result of the unqualified U.S. origin claims on the Class Products' packaging and marketing, consumers have been misled for years, leading to both initial and repeat purchases of products they believed were made in the United States with ingredients and components sourced from the United States.

101.   Despite the prominent and unqualified claim that the Class Products were "Made in the USA" and/or "Manufactured in the USA," they are made with foreign ingredients, a fact that is not properly disclosed on the label, as the MUSA Rule and California law, including the CA MUSA Rule, require.

102.   For example, the Products purchased by Plaintiffs each contain stevia leaf extract, an essential, low/no calorie, sugar-free sweetening ingredient that is not sourced from the United States.[29] Stevia is central to Defendants' formulation and

---

[28] For illustrative examples of Defendants' "Made in the USA" (or similar) claims appearing on Target.com and Walmart.com sales pages, *see* ¶ 97, *supra*.

[29] In 2023, the U.S.-based sweetener brand Splenda announced that it had become the first commercial grower and processor to cultivate, harvest, and extract stevia in the United States for use as a sweetener. Upon information and belief, this production is dedicated exclusively to Splenda's own products and is not available to other manufacturers. *See Splenda Stevia Farm Announces Official Operation of Its Fully Integrated U.S.-Based Stevia Farm, Building a New American Industry*, PR Newswire (Mar. 7, 2023), available at https://www.prnewswire.com/news-releases/splenda-stevia-farm-announces-official-operation-of-its-fully-integrated-

marketing of the Class Products as "zero sugar" electrolyte beverages, and its inclusion is a core component of the Products' value and appeal to consumers seeking low calorie and carbohydrate, sugar-free hydration.

103.   Stevia is a high-intensity sweetener derived from the leaves of the *Stevia rebaudiana* plant. It is used as a sugar substitute because it provides sweetness without adding calories and is commonly included in nutritional powders, beverages, and other food products marketed as "zero- or low-calorie." Without this ingredient, the Class Products could not achieve their sweetness profile without added sugars or calories, making stevia essential to the consumer value, formulation, and marketing of the Class Products.

104.   The importance of stevia to the Class Products' consumer appeal and value is evident from Defendants' pervasive promotion of their "no sugar" and "zero sugar" attributes. Defendants feature these claims prominently on product packaging, throughout their website, including their website's main page title bar, and across other advertising channels. Defendants position the absence of sugar as a defining benefit of the Class Products, appealing to consumers seeking healthier hydration options without added sugars or calories. This sustained emphasis underscores the material role of stevia as the ingredient that enables the Class Products to deliver their purported "zero sugar" benefits while maintaining a palatable and pleasing flavor.[30] The Class Products' "zero sugar" and "low carb"

---

us-based-stevia-farm-building-a-new-american-industry-301763822.html; *see also History of Stevia*, International Stevia Council, available at https://internationalsteviacouncil.org/about-stevia/history-of-stevia/ ("Today, the plant is primarily grown commercially in South America and Asia for the sweet components in its leaves.").

[30] Importantly, the inclusion of stevia leaf extract as a zero calorie sweetener mitigates and balances the strong salty flavor of the flavored Class Products, thereby providing significant value to consumers who would otherwise be unwilling to consume an electrolyte product with added sugar, added calories, or an unpalatably salty taste. The material impact of stevia on consumer preference and product

positioning creates a substantial differentiation from conventional electrolyte products, including well-known brands such as Gatorade and Powerade. Non-exhaustive examples of Defendants' marketing emphasizing these claims are shown below.



appeal is further reflected in the disparity in popularity and sales between the flavored Class Products and the raw, unflavored Class Product. *See infra* ¶ 123.













105.   Defendants' use of stevia leaf extract has enabled them to offer numerous flavored varieties of the Class Products that maintain sweetness and palatability without added sugar or substantial calories, thereby broadening the products' appeal across a wide range of consumers. By leveraging stevia's high-intensity sweetening properties, Defendants are able to market multiple flavor profiles that would otherwise be impractical or undesirable in an electrolyte formulation dominated by salt and mineral ingredients. This formulation strategy allows Defendants to attract consumers seeking flavorful, sugar-free hydration options and materially enhances the marketability, consumer acceptance, and perceived value of the Class Products.

106.   Upon information and belief, the combined sales of the flavored varieties of the Class Products substantially exceed, and dwarf, the sales of the Raw/Unflavored variety. This disparity reflects consumer preference for flavored, sweetened electrolyte products and demonstrates the central role of stevia in driving demand, repeat purchases, and overall sales volume. The dominance of flavored product sales underscores that stevia is not incidental or ancillary, but instead is integral to Defendants' product portfolio and overall business model.

107.    Other ingredients in the Class Products are likewise sourced from abroad. In addition to stevia, the Class Products all contain magnesium malate and potassium chloride[31] – neither of which is sourced from the United States.

_____

[31] *See* **Exhibit B** for a list of the Class Products with their corresponding ingredients.

108.    Magnesium malate[32] and potassium chloride[33] are key electrolytes essential to the formulation and function of the Class Products. Without these ingredients, the Class Products would be little more than common table salt (sodium chloride), an ingredient that virtually every consumer already possesses and as such provides no meaningful value when delivered without the inclusion of magnesium and potassium sourced from abroad.

---

[32] Magnesium malate is not an agricultural ingredient that occurs naturally in commercially meaningful form, but instead is a manufactured mineral salt produced through industrial chemical processing. As the European Food Safety Authority explains in its evaluation of di-magnesium malate, the ingredient is manufactured by reacting magnesium oxide with malic acid under aqueous conditions, followed by spray-drying and packing. *See* European Food Safety Authority, *Evaluation of di-magnesium malate, used as a novel food ingredient and as a source of magnesium in foods* (EFSA Journal 2018;16(6):5292), https://pmc.ncbi.nlm.nih.gov/articles/PMC7009340/ (manufacturing process description). Defendants likewise acknowledge that "malate is a malic acid derivative." *See Did You Know: Malic Acid*, Drink LMNT, https://science.drinklmnt.com/did-you-know/malic-acid.

As further reflected by global trade and supply data for magnesium feedstocks, the inputs used to produce magnesium malate are heavily concentrated outside the United States. World Integrated Trade Solution ("WITS") data show that China overwhelmingly dominates global exports of natural magnesium carbonate (magnesite), exporting approximately 2,563,620,000 kilograms in 2024, while the United States exported only 513,000 kilograms during the same period. *See* World Bank, WITS, *Natural Magnesium Carbonate (Magnesite) Exports by Country (HS 251910)* (2024), https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2024/tradeflow/Exports/partner/WLD/product/251910. Consistent with this concentration, industry and government sources describe global magnesia and magnesium supply chains as highly concentrated, with China dominating magnesia production and exports and serving as the leading supplier of magnesium in global markets. *See* Euromines, *Magnesia Industry Study* (2025) (China accounted for approximately 70 percent of global magnesia capacity and 68 percent of production in 2023), https://euromines.org/wp-content/uploads/2025/10/Euromines-Magnesia-Industry-Study.pdf.

Given (i) Defendants' admission that their magnesium malate incorporates malate

---

derived from malic acid, which itself is likely of foreign origin, *see infra* n.35; (ii) the documented concentration of magnesium feedstocks and magnesium supply chains outside the United States; and (iii) the economic, regulatory, and logistical realities of industrial chemical manufacturing, which make it substantially more efficient to synthesize magnesium malate in regions where both malic acid and magnesium inputs are abundant and where large-scale chemical processing infrastructure is well established, it is plausible, and more likely than not, that the magnesium malate used in the Class Products is of foreign origin. Finally, because magnesium malate is a niche, chemically manufactured compound rather than a traded commodity, granular trade data specifically tracking magnesium malate are not separately reported in public trade databases such as WITS.

[33] Potassium chloride, commonly referred to as potash, is a potassium-bearing mineral commodity for which the United States has limited domestic production capacity. The United States relies overwhelmingly on foreign sources to meet domestic potassium chloride demand, with imports supplying the vast majority of U.S. consumption. Canada is the world's largest producer and exporter of potash and possesses the world's largest potash reserves, and its geographic proximity to the United States, combined with established and economical cross-border rail transportation infrastructure, makes Canada a principal and efficient source of potassium chloride supplied to the U.S. market. Accordingly, potassium chloride incorporated into consumer products sold in the United States is highly likely to be imported and sourced from abroad. *See* EPA, *Potassium Chloride Supply Chain Profile* (Mar. 2023), https://www.epa.gov/system/files/documents/2023-03/Potassium%20Chloride%20Supply%20Chain%20Profile.pdf ("Canada, Russia, Belarus, and China accounted for 80% of world potash production in 2019, and global supply and demand from these select countries have historically dictated price and availability. The U.S., which imports approximately 17% of worldwide production, relies heavily on Canadian production to meet domestic demand, and supply is heavily reliant on rail transport from Saskatchewan."; "Total U.S. domestic production of potassium chloride was approximately 490 million kilograms (M kg) in 2018…. U.S. consumption of potassium chloride in 2018 is estimated at 9,491 M kg.");

World Bank, WITS/UN COMTRADE, *Potassium Chloride (HS 310420) – Imports by Country (2024)*, https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2024/tradeflow/Imports/partner/WLD/product/310420 (describing the United States as among the world's top three importers of potassium chloride)

Natural     Resources     Canada,     *Potash     Facts*,     https://natural-

1    109.    Given the importance of stevia and key electrolytes, magnesium and

2    potassium, to the overall utility and consumer desirability of the products, it is

3    implausible that the combined value or cost of the foreign ingredients represents

4    less than ten (10) percent in the products.

resources.canada.ca/minerals-mining/mining-data-statistics-analysis/minerals-metals-facts/potash-facts ("Canada is the world's largest producer and exporter of potash. Canada has the world's largest potash reserves…"; "The leading destinations of Canadian exports of potash were the United States (46%), Brazil (19%) and China (8%)")

110.    Additionally, the flavored varieties of the Class Products contain either citric acid[34] or malic acid[35] - ingredients that, upon information and belief, are sourced from outside the United States.

_____

[34] Although some citric acid is produced domestically, publicly available government and intergovernmental trade sources demonstrate that the United States relies heavily on imported citric acid. The U.S. Environmental Protection Agency has reported that domestic citric acid manufacturing has declined over the past two decades and that U.S. demand is increasingly met through imports. *See* U.S. Environmental Protection Agency, *Citric Acid Supply Chain Profile* (Mar. 2023), https://www.epa.gov/system/files/documents/2023-03/Citric+Acid+Supply+Chain+Profile.pdf

Consistent with this import dependence, WITS data from the World Bank identifies the United States as the largest global importer of citric acid by value in 2023. *See* World Bank, WITS, *Citric Acid Imports (HS 291814)*, https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2023/tradeflow/Imports/partner/WLD/product/291814 The same WITS data identifies foreign producers, including Thailand and Belgium, among the leading global exporters of citric acid. *See* World Bank, WITS, *Citric Acid Exports (HS 291814)*, https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2023/tradeflow/Exports/partner/WLD/product/291814.

Reflecting the competitive impact of these imports on the domestic market, the U.S. International Trade Commission has, on multiple occasions, conducted antidumping investigations and imposed antidumping duty orders concerning imports of "citric acid and certain citrate salts," including prior investigations involving imports from Belgium and Thailand, and in January 2026 instituted new antidumping and countervailing duty investigations concerning imports from Canada and India. *See* U.S. International Trade Commission, *Citric Acid and Certain Citrate Salts Investigations*, https://www.usitc.gov/keywords/citric_acid_and_certain_citrate_salts; *see also Citric Acid and Certain Citrate Salts from Canada and India; Institution of Antidumping and Countervailing Duty Investigations*, 91 Fed. Reg. 3221 (Jan. 26, 2026), https://www.federalregister.gov/documents/2026/01/26/2026-01404/citric-acid-and-certain-citrate-salts-from-canada-and-india-institution-of-antidumping-and

The repeated initiation of such trade investigations underscores that domestic production has not been sufficient to meet U.S. demand without significant reliance

111.   In addition to the aforementioned ingredients, certain varieties of the Class Products contain other ingredients that are unquestionably sourced from outside the United States. For example, the Mango Chili flavor of Defendants' Drink Mix contains natural mango[36] flavor, which is not sourced domestically. Likewise, the

on imports, as the existence of abundant and readily available domestic supply would obviate the need for ongoing antidumping and countervailing duty proceedings. Accordingly, given the United States' documented import dependence and the established role of foreign producers in supplying the U.S. market, it is plausible that the citric acid used in Defendants' products is of foreign origin.

[35] Malic acid, by Defendants' own admission, is not an agricultural ingredient that is harvested or extracted in commercially meaningful quantities, but rather is manufactured through industrial chemical or microbial fermentation processes. *See Did You Know: Malic Acid*, Drink LMNT, https://science.drinklmnt.com/did-you-know/malic-acid/ (explaining that although malic acid occurs naturally in plants, it "can't be extracted in a cost-effective way" and is therefore manufactured through processes including petrochemical synthesis and microbial fermentation). Industrial production of malic acid is thus concentrated among large-scale chemical and biotechnology manufacturers, which are overwhelmingly located outside the United States, particularly in China. *See* Yongyan Xi, Feiyu Fan & Xueli Zhang, *Microbial L-malic Acid Production: History, Current Progress, and Perspectives*, 1 GREEN CARBON 118, 119–20 (2023).

As summarized in Tables 1 and 2 of Xi *et al.*, current global malic acid production capacity is approximately 192,000 tons per year, with an additional 155,000 tons per year of capacity under construction or proposed, for a combined current and near-term global capacity of approximately 347,000 tons annually. Of that amount, 314,000 tons per year, more than 90% of total current and planned capacity, is expressly identified as being located outside the United States. *Id.* The remaining 33,000 tons per year is categorized as "Others," without any indication that such capacity is located in the United States. *Id.* Thus, even assuming counterfactually that *all* "Others" capacity were domestic, foreign producers would still account for approximately 90.5% of global malic acid production capacity. Accordingly, it is plausible that the malic acid used in Defendants' products is of foreign origin.

[36]  *See*  https://powo.science.kew.org/taxon/urn:lsid:ipni.org:names:69913-1  (The distribution map reflects that the *Mangifera indica* (mango) species is native to regions of South and Southeast Asia. Within the United States, the species is identified only in Florida, where it has been introduced and does not occur as part

Chocolate Salt and Chocolate Caramel varieties contain cocoa powder,[37] which is also sourced from outside the United States. Additionally, the Mango Chili product contains natural chili[38] flavor, which, upon information and belief, is not sourced domestically.

112.   Despite the numerous foreign ingredients contained in the Class Products, Defendants prominently, uniformly, and without qualification represent these products as "Made in the USA" and/or "Manufactured in the USA" on their packaging and throughout their marketing materials.

113.   Upon information and belief, these products also contain additional foreign-sourced ingredients and components, further rendering Defendants' representations

---

of its native range. There is no indication that the species is cultivated or harvested at commercial scale within the United States. By contrast, the species is widely present across numerous foreign regions where it is indigenous, established, and commercially exploited. The ingredient at issue is "natural mango flavor," which is derived through processing and extraction of the fruit rather than simple mechanical handling. Such processing is typically performed where the species is abundant and supply chains are well developed. Given the species' overwhelming foreign presence, its extremely limited domestic occurrence confined to a single state, and the nature of mango flavor production, the ingredient is almost certainly of foreign origin.); *see also* https://www.fao.org/faostat/en/#data/QCL/visualize (Select Item: Mangoes, guavas and mangosteens. According to the Food and Agriculture Organization of the United Nations, the United States is not a significant producer of mangoes and does not rank among the world's top ten mango-producing countries. By contrast, FAO production data reflect that global mango production is heavily concentrated outside the United States, with India accounting for a dominant share of worldwide output.).

[37] *See* https://www.fao.org/faostat/en/#data/QCL/visualize (Select Item: Cocoa beans. According to the Food and Agriculture Organization of the United Nations, the United States is not a commercial producer of cocoa beans.)

[38] *See* https://www.fao.org/faostat/en/#data/QCL/visualize (Select Item: Chillies and peppers, dry (Capsicum spp., Pimenta spp.). According to the Food and Agriculture Organization of the United Nations, the United States is not a commercial producer of dry chilies.)

---

false, unfair, and deceptive.

114.   Defendants' failure to disclose the use of foreign ingredients and components results in unqualified U.S.-origin claims that are unlawful, false, misleading, and likely to deceive reasonable consumers.

115.   There is no federal or state law, rule, or regulation that requires products such as the Class Products to bear a "Made in the USA," "Manufactured in the USA," or any similar U.S. origin representation. Defendants' decision to include unqualified U.S. origin claims on the Class Products' packaging and in their marketing materials is therefore voluntary and driven solely by marketing, branding, and product-positioning considerations, rather than by any legal or regulatory obligations.

116.   Had Plaintiffs and other consumers similarly situated been made aware that the Class Products contained ingredients, including key ingredients, sourced from outside of the United States, they would not have purchased the Class Products.

117.   Plaintiffs and consumers similarly situated are accustomed to seeing U.S. origin claims that are expressly qualified when products are made using foreign ingredients, such as representations stating "Made in the USA using global ingredients" or similar disclosures. In this marketplace context, Defendants' use of unqualified "Made in the USA" and "Manufactured in the USA" representations conveyed to reasonable consumers that the Class Products and their ingredients were wholly or substantially of U.S. origin. By omitting any qualifying disclosure despite the presence of foreign-sourced ingredients, Defendants created a misleading net impression that deceived Plaintiffs and other consumers into believing the Class Products met a higher domestic-origin standard than they in fact did. Non-exhaustive examples of Defendants' competitors and other consumer products using properly qualified U.S. origin claims are shown below:





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22  118.   The origin of other ingredients, components, and even packaging used by
23  Defendants in the Class Products cannot be definitively traced through publicly
24  available information - and since this information is exclusively known to
25  Defendants at this time - Plaintiffs cannot fully allege the extent of Defendants'
26  unqualified "Made in the USA" violations. These important facts are within the
27  exclusive knowledge, control, and possession of Defendants, their contract
28  manufacturers and their agents, and cannot be fully ascertained or alleged without

the benefit of discovery.

119. Defendants' willful disregard for the laws discussed herein for financial gain is well established by the aforementioned, non-exhaustive examples.

120. Specifically, Defendants' conduct violates the MUSA Rule because they make unqualified U.S.-origin claims, such as "Made in the USA" and "Manufactured in the USA," when, in fact, not "all or virtually all" ingredients and components are sourced domestically, as required by 16 C.F.R. § 323.2.

121. In addition to violating the MUSA Rule, Defendants' conduct also violates the CA MUSA Rule, including the safe harbor provisions set forth in Business and Professions Code § 17533.7(c). At a minimum, the second (magnesium malate) and third (potassium chloride) ingredients in each and every Class Product are foreign-sourced. When considered together with the other foreign-sourced ingredients described herein, it is highly improbable that such ingredients represent less than ten (10) percent of the final wholesale value of each of the Class Products, especially when common table salt, which itself may be foreign, is very inexpensive.[39]

122. Without magnesium malate and potassium chloride, the Class Products could not truthfully be described as "electrolytes," the very characteristic that forms their primary selling proposition. Absent these foreign-sourced ingredients, the products would consist largely of common table salt - an ingredient of negligible value to consumers, as virtually every consumer already possesses it at home and would not pay a premium for it.

---

[39] For example, a 26-ounce container of Morton's Salt retails for approximately $2.99 in Los Angeles, California. At that price, salt costs about $0.115 per ounce ($2.99 ÷ 26 oz = $0.115/oz). Accordingly, if Defendants' entire product packet (0.21 oz, or 5.91 g) were composed entirely of salt, which it is not, the retail value of the product packet would be approximately $0.02 ($0.115 × 0.21 = $0.024). Defendants, purchasing salt in bulk at wholesale, would pay substantially less than this amount, underscoring the negligible monetary value of salt in the Class Products. *See* https://www.vons.com/shop/product-details.114100008.html

123. Without foreign-sourced stevia, which is present in every flavored Class Product, the products would be unpalatable and would lack the consumer appeal associated with pleasant-tasting electrolyte beverages and drink mixes. This is evidenced by the stark difference in sales between the flavored varieties of the Class Products and the Raw/Unflavored version. Non-exhaustive examples illustrating this disparity in consumer demand, including comparative sales and purchasing data for the flavored Class Products versus the Raw/Unflavored version as displayed on Amazon, are shown below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





124.    In short, the foreign-sourced magnesium malate, potassium chloride, and stevia provide substantial value to consumers and are essential to the desirability and commercial success of the Class Products. Accordingly, based on the nature, function, and necessity of these foreign-sourced ingredients to the Class Products' function, flavor and consumer appeal, it is reasonable to infer that they constitute at least ten percent of the Products' final wholesale value.

125.    Defendants' noncompliance with the laws governing "Made in the USA" claims is further underscored by the fact that they continue to sell products bearing the same unqualified "Made in the USA" and "Manufactured in the USA" representations in jurisdictions where no statutory safe harbors exist at all. Because the federal MUSA Rule applies nationwide and imposes independent and strict

requirements for unqualified U.S.-origin claims, Defendants' continued nationwide use of the same unqualified labeling, including through Amazon, Walmart.com, Target.com and their website, which all market and sell products to consumers throughout the United States, confirms that Defendants are not attempting to comply with federal law. This uniform nationwide conduct makes it not merely plausible, but probable, that Defendants' products also fail to comply with the applicable California laws governing "Made in the USA" representations, including statutory safe harbors.

126.   The origin of some ingredients and components, including packaging, cannot be definitively traced through publicly available information. Upon information and belief, the Class Products contain other ingredients and components, including packaging, that are not made in or sourced from the United States. These important facts are within the exclusive knowledge, control, and possession of Defendants, their suppliers and contract manufacturers, and cannot be fully ascertained or alleged without the benefit of discovery. Nevertheless, Defendants' willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.

127.   There is no reliable, competent, or commercially available laboratory testing method capable of determining the country of origin of ingredients from finished consumer products. Origin determinations depend on supply-chain documentation, sourcing records, and manufacturer-controlled Certificates of Analysis ("COA") and supplier disclosures, all of which are exclusively within Defendants' possession. Plaintiffs therefore cannot obtain this information through testing, and the truth or falsity of Defendants' sourcing representations can only be verified through discovery of Defendants' and their agents' records.

128.   Defendants possess superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

129.   The ratios, concentrations, and costs of the ingredients and components used

in the Class Products are exclusively within the knowledge, control, and possession of Defendants and their agents. Plaintiffs have no access to this information and cannot reasonably determine or approximate these figures without discovery. Even if general values, costs, or market prices for certain ingredients were publicly available, such data would not reflect Defendants' actual costs, which depend on confidential supplier relationships, private contracts, and undisclosed bargaining power.

130.   The identities of Defendants' suppliers, contract manufacturers, and other entities involved in the sourcing and production of the Class Products are likewise not publicly available and are presently unknown to Plaintiffs. These facts, along with other material information regarding ingredient origin, composition, and valuation, can be readily obtained from Defendants through discovery.

131.   Absent discovery, or resorting to unlawful means, such as industrial espionage or the breach of confidentiality obligations that likely govern Defendants' proprietary formulations, Plaintiffs have no conceivable way to determine the precise ratios, costs, or sourcing details of the ingredients contained in Defendants' products.

132.   Most consumers have limited awareness that products, along with their ingredients and components, labeled or marketed as made in the United States may, in fact, contain ingredients or components sourced, grown, or manufactured in foreign countries. This is a material factor in many purchasing decisions, as consumers believe they are buying superior goods while supporting American companies and jobs. Consumer disclosure regarding the true origin of products and their ingredients is therefore a central rationale underlying federal and state "Made in the USA" laws, including the MUSA Rule and the CA MUSA Rule.

133.   American consumers generally perceive products, ingredients, and components of U.S. origin as being of higher quality than their foreign counterparts.

134.   Ordinary consumers are not experts in consumer product or beverage

formulations, nor are they expected to possess specialized knowledge concerning the nature, benefits, or origin of product ingredients. Consumers reasonably rely on manufacturers to accurately represent their products, particularly when presented with claims such as cognitive-benefit representations or unqualified "Made in the USA" representations on labeling or in marketing materials. There is no reason for consumers to question such representations or to suspect that a manufacturer would deliberately misstate the contents, composition, benefits or characteristics of its products.

135.   On information and belief, Defendants either charged a premium for the Class Products compared to their competitors or gained a competitive advantage by having the Class Products chosen over others based on false, unqualified "Made in the USA" and/or "Manufactured in the USA" claims. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

136.   Defendants have been on notice of the unlawful nature of their cognitive claims and unqualified "Made in the USA" representations since at least June 2025, when they received Plaintiffs' pre-suit notice under the CLRA. Despite that notice, Defendants have failed to provide Plaintiffs or their counsel with any documentation substantiating the challenged claims, including any clinical studies, journal articles, sourcing records, COAs, supplier disclosures, formulation data, or other materials that would support their representations. Instead, Defendants have issued only blanket denials of wrongdoing. Had Defendants possessed and produced competent substantiation supporting their claims, this litigation could have been avoided. Defendants' continued refusal to produce such documentation, despite clear notice and opportunity to do so, is telling.

### FACTS SPECIFIC TO PLAINTIFFS NATALIE GIANNE AND TORI POWELL

#### Plaintiff Natalie Gianne

137.   On or about December 9, 2023, Plaintiff Gianne searched online while at her

home in Los Angeles County, California, looking to purchase hydration and electrolyte products.

138.   While browsing various products available for purchase online, Plaintiff Gianne came across the Products on Amazon. Browsing Amazon, Plaintiff Gianne reviewed information and marketing materials about LMNT's Electrolyte Drink Mix.

139.   Marketing images of the Class Products, including the Products, displayed on Amazon, prominently featured the claim "FEEL THE DIFFERENCE. *All-day energy* starts with optimal hydration. *More energy*. *No brain fog* or cramps. You feel the difference when you get it right" (emphasis added), which Plaintiff Gianne saw, read, and relied upon.[40]

140.   In addition to these claims, the Products were described as providing other benefits on the same page, including "Sustain Focus" and "Satiate Cravings."

141.   The Products were also labeled and marketed as "Manufactured in the USA," and, in some instances, "Made in the USA," both of which are unqualified representations, despite the inclusion of foreign-sourced ingredients in their formulations. These representations appear on the individual product pages for the Class Products and are visible in images depicting the Products themselves.

142.   Also, the particular "LMNT Zero Sugar Electrolytes – Raspberry Salt | Drink Mix | 30-Count" Plaintiff Gianne purchased from Amazon included various representations regarding its supposed cognitive benefits and US origin. For instance, the language "FEEL THE DIFFERENCE: All-day energy starts with optimal hydration. More energy. No brain fog or cramps. You feel the difference when you get it right" appeared under the "About this item" section of the product's Amazon.com page. Additionally, one of the product's images on Amazon prominently portrayed iconography of the American flag with the words "MADE

---

[40] *See supra* ¶ 62.

IN THE USA." The same language continues to appear on Amazon.[41]

143.  Relying on the above representations, just as any reasonable consumer would, and seeking to purchase a product that (a) provided cognitive benefits and (b) was made in the United States with domestic ingredients, Plaintiff Gianne purchased a 30-count box of the Product (Raspberry Salt flavor) for approximately $45.00 (excluding tax and shipping) from Amazon, for her personal use.

144.  Later, on January 31, 2025, Plaintiff Gianne encountered single stick packs of the "LMNT Zero Sugar Electrolytes – Citrus Salt | Drink Mix," available for individual purchase, at Perspire Sauna Studio in Santa Monica, California. Still operating under the belief – based on Defendants' previous representations – that the Product offered cognitive benefits and was of US origin, especially since the back of the Product's packaging included the language "MANUFACTURED IN THE USA," Plaintiff Gianne purchased a single stick pack of the "LMNT Zero Sugar Electrolytes – Citrus Salt | Drink Mix" for $4.00, excluding taxes, for her personal use.

<u>Plaintiff Tori Powell</u>

145.  On or about January 18, 2024, Plaintiff Powell searched online while at her home in San Diego County, California, looking to purchase hydration and electrolyte products.

146.  While browsing various products available for purchase online, Plaintiff Powell encountered the Products on Defendants' website (the "Website"), where she reviewed information, marketing materials, and images of LMNT's Electrolyte Drink Mix.

147.  On the Website, Defendants represented on the Product packaging that it was "Manufactured in the USA." This unqualified claim appeared in the product images displayed on the Product sales page and was not accompanied by any disclosure

---

[41] https://www.amazon.com/LMNT-Zero-Sugar-Electrolytes/dp/B07SH31T9V?th=1.

regarding the use of foreign-sourced ingredients or components. Plaintiff Powell viewed and read the "Manufactured in the USA" representation on each of the Product flavors she examined.

148.    While visiting Defendants' Website, Plaintiff Powell came across a webpage for Defendants' "LMNT INSIDER Bundle," which allows a customer to choose three (3) 30-count boxes of different single stick packs along with a bonus item. While reviewing that webpage, Plaintiff Powell came across pictures of the ingredient panel for each flavor of the Product, including the Grapefruit Salt, Citrus Salt, and Raspberry Salt flavors, which indicated that the Products were all "Manufactured in the USA."

149.    As of at least January 28, 2026, Defendants' webpage on the Website for the "LMNT INSIDER Bundle" represents each flavor of the Product as being "MADE IN THE USA" with iconography of the American flag.[42]

150.    Relying on these representations, as any reasonable consumer would, and intending to purchase a product made in the United States with U.S.-sourced ingredients and components, Plaintiff Powell purchased the "LMNT INSIDER Bundle," which included three (3) 30-count boxes of the Product (Grapefruit Salt, Citrus Salt, and Raspberry Salt) for $135.00, exclusive of tax and shipping, for her personal use. As part of her purchase, Plaintiff Powell also received the Chocolate Caramel flavor of the Product as a bonus item.

151.    Plaintiffs' reliance on Defendants' representations were reasonable under the circumstances. Ordinary consumers are not experts in consumer product formulations, nor are they expected to possess specialized knowledge regarding the

---

[42]    https://drinklmnt.com/products/lmnt-insider-bundle?utm_source=google&utm_medium=cpc&utm_campaign=evergreenmisspellcold&gad_source=1&gad_campaignid=21002967780&gbraid=0AAAAAC5L3cePIEEx5tupoq4mC21M6N1_T&gclid=Cj0KCQiAhOfLBhCCARIsAJPiopPl0xYhTHiqLIWD3MPeFOkKHIZqNwom4TGtBT087aPlmGuZp-zN2oIaAnX6EALw_wcB&variant=31177433382935 (last accessed Jan. 28, 2026).

nature, benefits or origin of product ingredients. Consumers reasonably trust that manufacturers will accurately represent their products, particularly when claims such as improving "Brain Fog" and "Focus" as well as "Made in the USA" are prominently displayed on product labeling and/or in marketing materials. There is no reason for consumers to doubt these representations or to suspect that a manufacturer would deliberately misstate the characteristics of its products.

152.   For instance, when consumers encounter explicit representations in a product's marketing - such as claims promoting cognitive benefits - they reasonably expect the product to provide those benefits. A reasonable consumer would not anticipate that the product fails to perform as advertised.

153.   Similarly, Plaintiffs' reliance on Defendants' unqualified "Made in the USA" representations was reasonable. Consumers are accustomed to seeing qualified disclosures, such as "Made in the USA with globally sourced ingredients," on product packaging and marketing if and when such U.S. origin claims are made. Accordingly, when consumers encounter an unqualified "Made in the USA" or similar claim, they reasonably understand it to mean that the product contains no foreign-sourced ingredients or components.

154.   Defendants were under no legal obligation in the United States to label or market the Class Products as being of U.S. origin. However, once such representations are made, they are subject to strict regulatory standards. Defendants' use of "Made in the USA" and "Manufactured in the USA" claims for the Class Products served no regulatory or compliance purpose. Rather, it was employed solely as a marketing device to enhance the Class Products' appeal to consumers such as Plaintiffs.

155.   Defendants' representations regarding the Class Products were unlawful, unfair, deceptive, and misleading, in that the Class Products (a) do not provide the advertised cognitive benefits and (b) were made with and/or contain ingredients or components that were sourced, grown, or manufactured outside the United States.

156.   Accordingly, Defendants are not entitled to lawfully make the cognitive benefit claims as well as the unqualified "Made in the USA" and "Manufactured in the USA" claims that they made on and regarding the Products and Class Products.

157.   Defendants' representations were material to Plaintiffs' decision to purchase the Products.

158.   In deciding to purchase the Products, Plaintiffs relied on the labeling, marketing, and/or advertising prepared and approved by Defendants and their agents, as disseminated through the Class Products' packaging and marketing containing the misrepresentations alleged herein.

159.   Had Plaintiff Gianne known that the Products did not provide the advertised cognitive benefits, she would not have purchased the Products or would have paid less for them.

160.   Had both Plaintiffs known that the Products and Class Products contained foreign ingredients and components, they would not have purchased the Products or would have paid less for them.

161.   Plaintiffs would not have purchased the Products, or would have paid less for them, but for Defendants' cognitive benefit claims and/or unqualified "Made in the USA" and "Manufactured in the USA" representations on the Products and Class Products.

162.   As a result, Plaintiffs were harmed because Defendants took Plaintiffs' money due to their unlawful, false, unfair, and deceptive misrepresentations on the Class Products, including the Products.

163.   Each time Plaintiffs and putative Class members purchased the Class Products, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

164.   Consequently, Plaintiffs and other similarly situated consumers were deceived by Defendants' unlawful actions.

165.   Plaintiffs believed, at the time of purchase, that the Products were of superior

quality and that they were supporting U.S. jobs, the U.S. economy, the environment, and ethical working conditions by purchasing a product made with U.S.-sourced ingredients, rather than foreign-sourced, grown, or made ingredients.

166.   Ingredients and components grown or manufactured in the USA are subject to strict regulatory requirements, including, but not limited to, agricultural, environmental, labor, safety, ethical, and quality standards.

167.   Foreign sourced, grown, or manufactured ingredients and components are not subject to the same U.S. standards and may pose greater risks to consumers, the environment, and the U.S. economy. This concern is especially significant for products intended for human consumption, like beverage or beverage mix products.

168.   Foreign-sourced, grown, or manufactured ingredients and components are generally of lower quality and less reliable than their U.S. origin counterparts.

169.   False, unqualified, unfair and deceptive representations that products are "Made in the USA" and/or "Manufactured in the USA" reduce overall customer satisfaction compared to if such products were genuinely made in the U.S. using ingredients and components sourced, grown, or made domestically.

170.   The Class Products, including the Products purchased by Plaintiffs, contain foreign ingredients and are not worth the purchase price paid by Plaintiffs and putative Class members.

171.   The precise amount of damages will be proven at the time of trial.

172.   Plaintiffs and Class members suffered harm as a direct result of Defendants' false, unlawful, unfair, and deceptive representations, including but not limited to their misleading cognitive benefit claims, as well as their unqualified "Made in the USA" and "Manufactured in the USA" claims.

173.   Defendants' false, unlawful, unfair, and deceptive advertising of the Class Products presents an ongoing threat to consumers, as this conduct continues to this day through Defendants' direct actions and/or omissions, and/or through the conduct of their agents.

**CLASS ALLEGATIONS**

174.   Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals.

175.   Plaintiff Gianne is a member of and seeks to represent a Cognitive Benefit Class, pursuant to Fed. R. Civ. P. 23(b)(2), and 23(b)(3), defined as:

> All persons in California who, between February 25, 2022 and February 25, 2026, purchased one or more of the Class Products that were marketed or represented as providing cognitive benefits, such as relief from "brain fog," or enhanced or sustained "focus," or any similar claim, whether on product packaging or in marketing materials.

176.   Plaintiffs are both members of and seek to represent a MUSA Class, pursuant to Fed. R. Civ. P. 23(b)(2), and 23(b)(3), defined as:

> All persons in California who, between February 25, 2022 and February 25, 2026, purchased one or more of the Class Products that were marketed or represented as "Made in the USA," "Manufactured in the USA," or any synonymous representation on the product or in its marketing materials, but which contain and/or are made with ingredients or components not grown or manufactured in the USA.

177.   The Cognitive Benefit Class and MUSA Class shall be referred to herein jointly as the "Class."

178.   Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Further excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

179.   Plaintiffs reserve the right to modify the proposed Class definition, including but not limited to expanding the Class to protect additional individuals, including in other states, and to assert additional sub-classes as warranted by additional investigation.

180.   <u>Numerosity</u>: The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of thousands of individuals within California.

181.   <u>Commonality</u>: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendants;

- Whether the Class Products contain ingredients that provide cognitive benefits;

- Whether the Class Products are or have been made with foreign ingredients or components;

- Whether the Class Products are or have been represented as being of U.S. origin without clear and adequate qualification;

- Whether Defendants intentionally misrepresented or omitted the fact that the Class Products, including the Product purchased by Plaintiffs and other Class members, were misbranded and thus sold unlawfully in California;

- Whether Defendants knew or should have known that their business practices were unfair and/or unlawful;

- Whether Defendants' conduct violated the CLRA;

- Whether Defendants' conduct violated the FAL;

- Whether Defendants' conduct was "unlawful" as that term is defined in the UCL;

- Whether Defendants' conduct was "unfair" as that term is defined in the UCL;

- Whether Defendants' conduct was "fraudulent" as that term is defined in the UCL;

- Whether Defendants' conduct was "unfair, deceptive, untrue or misleading" as those terms are defined in the UCL;

- Whether Defendants were unjustly enriched by their unlawful, unfair and deceptive business practices;

- Whether Defendants breached express warranties to Plaintiffs and members of the Class;

- Whether Defendants intentionally misrepresented their products;

- Whether Plaintiffs and members of the Class suffered monetary damages as a result of Defendants' conduct and, if so, the appropriate amount of damages; and

- Whether Plaintiffs and members of the Class are entitled to injunctive relief, including public injunctive relief.

182.  <u>Typicality</u>: Plaintiffs' claims are typical of those of the Class. Plaintiffs and all members of the Class have been harmed by Defendants' wrongful practices. Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of the Class and are based on the same legal theories. Specifically, Plaintiffs purchased one or more of the Class Products that were labeled, represented and/or advertised as: (1) providing cognitive benefits - such as relief from "brain fog," or enhanced or sustained "focus"; and (2) being "Made in the USA" and/or "Manufactured in the USA" or a similar representation, without clear and adequate qualification of the foreign ingredients or components contained therein.

183.  <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent

and protect the interests of members of the Class. Plaintiffs' counsel is competent and experienced in litigating consumer class actions. Plaintiffs have retained counsel experienced in consumer protection law, including complex class action litigation involving unfair business practices. Plaintiffs have no adverse or antagonistic interests to those of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of Plaintiffs and the proposed Class.

184. <u>Predominance</u>: Defendants have engaged in a common course of conduct toward Plaintiffs and members of the Class, in that Plaintiffs and members of the Class were induced to purchase the Class Products. The common issues arising from Defendants' conduct affecting members of the Class set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

185. <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Class would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

186. Unless the Class is certified, Defendants will retain monies received as a result of their unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendants will also likely continue to advertise, market, label, promote and package the Class Products in an unlawful, unfair, deceptive and

KAZEROUNI
LAW GROUP, APC

misleading manner, and members of the Class will continue to be deceived, misled, harmed, and denied their rights under California law.

187.    Defendants have acted on grounds that apply generally to the Class, so that Class certification is appropriate.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act ("CLRA")
### (Cal. Civ. Code § 1750, *et seq.*)

188.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

189.    California Civil Code Section 1750, *et seq.,* entitled the Consumer Legal Remedies Act ("CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."

190.    The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia,* that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protections.

191.    Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in the sale of consumer products to consumers.

192.    Plaintiffs and the Class members are not sophisticated experts with independent knowledge of product labeling, marketing practices and/or ingredient benefits or sourcing. Plaintiffs and the Class members are California consumers who purchased the Class Products for personal, family or household purposes.

193.    Defendants are each a "person" as defined by Cal. Civ. Code § 1761(c).

194.    The Class Products that Plaintiffs and other Class members purchased from Defendants constitute "goods" as defined pursuant to Cal. Civ. Code § 1761(a).

195.    Plaintiffs, and the Class members, are each a "consumer" as defined pursuant to Cal. Civ. Code § 1761(d).

196.    Plaintiffs' and the Class members' purchases of Defendants' products constituted a "transaction" as defined pursuant to Cal. Civ. Code § 1761(e).

197.    Cal. Civ. Code §§ 1770(a)(2), (4), (5), (7) and (9) of the CLRA provide that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods or services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised.

198.    Defendants violated Cal. Civ. Code §§ 1770(a)(2), (5), (7), and (9) by marketing and representing the Class Products as providing cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus." In truth, the Class Products lack the ingredients necessary to produce the advertised cognitive benefits and, therefore, do not deliver the benefits represented. As a result, Class Products were falsely, deceptively, and unlawfully marketed in violation of the CLRA.

199.   Additionally, Defendants violated Cal. Civ. Code §§ 1770(a)(2), (4), (5), (7), and (9) by falsely marketing and representing the Class Products as "Made in the USA" and "Manufactured in the USA" without qualification, even though they contain ingredients and/or components that are sourced, grown, and/or manufactured outside the United States.

200.   Plaintiffs further allege that Defendants committed these acts with full awareness of the harm it would cause and engaged in such unfair and deceptive conduct despite this knowledge.

201.   Defendants knew or should have known that their representations about the Class Products, as described herein, violated federal regulations and state laws, including consumer protection laws, and that these statements would be relied upon by Plaintiffs and Class members.

202.   As a direct and proximate result of Defendants' violations of Cal. Civ. Code §§ 1750, *et seq*., Plaintiffs and Class members have suffered harm by paying for the Class Products, which they would not have purchased had they known the products were unlawfully, falsely, unfairly, and deceptively labeled and/or marketed.

203.   Plaintiffs and the Class suffered monetary harm as a result of Defendants' conduct because: (a) they would not have purchased the Class Products on the same terms had it not been for Defendants' unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the Class Products or chose them over competing products due to Defendants' marketing misrepresentations and deceptive labeling, as discussed herein.

204.   As a result of Defendants' false, unlawful, unfair, and deceptive misrepresentations regarding the Class Products, Plaintiffs suffered economic harm, as their money was taken under false pretenses. Defendants' unlawful conduct included misrepresenting the contents of the Class Products, as well as the true nature and origin of the Class Products and their ingredients.

205. Plaintiffs and Class members reasonably relied upon Defendants' representations regarding the Class Products, and Plaintiffs and the Class reasonably expected that the Class Products would not be misbranded, unlawfully labeled or marketed in a unfair, deceptive and misleading manner.

206. Thus, Plaintiffs and the Class reasonably relied to their detriment on Defendants' unlawful, unfair, deceptive and misleading representations.

207. Pursuant to California Civil Code § 1782(a), on or about June 10, 2025, Plaintiffs sent Defendants a notice and demand for corrective action (the "CLRA Demand") via certified mail, informing Defendants of their violations of the CLRA and demanding that they cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith.

208. Plaintiffs sent a similar notice upon non-parties Amazon.com Services LLC and Sweat Equity Group, LLC d/b/a Perspire Sauna Studio on January 28, 2026, pursuant to Cal. Civ. Code § 1782(a).

209. As the alleged violations were not cured by Defendants within 30 days of the CLRA Demand made to them, Plaintiffs, on behalf of themselves and the Class, seek damages and attorneys' fees pursuant to Cal. Civ. Code § 1782(d).

210. As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and Class members are entitled to a declaration that Defendants violated the CLRA.

211. Pursuant to Cal. Civ. Code § 1780(a) and (b), Plaintiffs and the putative Class are entitled to, and hereby seek, injunctive relief to prohibit such conduct in the future, as well as damages.

212. Attached hereto as **Exhibit B** are sworn declarations from each of the Plaintiffs pursuant to Cal. Civ. Code § 1780(d).

//

//

//

## SECOND CAUSE OF ACTION
### Violations of California's Unfair Competition Law ("UCL")
### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

213.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

214.   Plaintiffs bring this claim individually and on behalf of the Class for Defendants' violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

215.   Plaintiffs and Defendants are each "person[s]" as defined by Cal. Bus. & Prof. Code § 17201.

216.   Cal. Bus. & Prof. Code § 17204 authorizes a private right of action on both an individual and representative basis.

217.   "Unfair competition" is defined by Cal. Bus. & Prof. Code § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."

218.   The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

219.   Through the conduct alleged in detail above and herein, Defendants engaged in unlawful, unfair, deceptive and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### A. *"Unlawful" Prong*

220.   Defendants have committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

221.  Defendants violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as providing cognitive benefits when they did not. Defendants also violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as "Made in the USA" and "Manufactured in the USA" without disclosing the inclusion of foreign-sourced ingredients and components.

222.  Specifically, by manufacturing, distributing, and/or marketing the Class Products with false, unlawful, unfair and deceptive claims, Defendants violate the FDCA, 21 U.S.C. §§ 343(a) and (k); Cal. Health & Safety Code §§ 110660, 110740, 110760, 110765, 110770;  the CLRA; the MUSA Rule; and the CA MUSA Rule.

223.  Defendants falsely, unlawfully, unfairly, and deceptively represent that the Class Products provide cognitive benefits when, in fact, they do not. In reality, the Class Products lack the necessary nootropic ingredients required to produce the advertised cognitive effects.

224.  Defendants also falsely, unfairly and deceptively represent that the Class Products as "Made in the USA" and/or "Manufactured in the USA," without clear and adequate qualification, despite containing substantial ingredients and/or components that are sourced, grown, or manufactured in foreign countries.

225.  Aside from the unlawful conduct described herein, Defendants have other reasonably available alternatives to advance their business interests, such as accurately, truthfully, and lawfully advertising, marketing, labeling, and selling the Class Products.

226.  Instead, Defendants deliberately and deceptively misled consumers through unlawful and unfair practices for their own economic gain.

227.  Plaintiffs and Class members reserve the right to allege additional violations of law that constitute unlawful business practices or acts, as such conduct is ongoing and continues to this day.

//

## B. *"Unfair" Prong*

228.   Defendants have engaged in acts of unfair competition prohibited by Cal. Bus. & Prof. Code §§ 17200, *et seq*.

229.   Defendants engaged in a pattern of "unfair" business practices that violate both the letter and the intent of the aforementioned statutes and regulations. Defendants' conduct threatens an incipient violation of the law or violates the policy and spirit of the law by manufacturing, distributing, and/or marketing their products with false, unfair and deceptive claims.

230.   The utility of such conduct, if any, is vastly outweighed by the harm it inflicts, particularly through the manufacturing, distribution, and/or marketing of the Class Products by means of (a) false representations that they provide cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus"- when in fact they do not and (b) unqualified, unfair, and deceptive representations that they are "Made in the USA" and/or "Manufactured in the USA," when in fact they contain foreign ingredients and components.

231.   As a result of Defendants' conduct: (1) the injury to consumers was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was one that consumers could not have reasonably avoided.

232.   Without limitation, Defendants' knowing mislabeling and false, unlawful marketing of the Class Products constitute unlawful, unfair, and deceptive business practices, misleading consumers into believing they are purchasing products that (a) provide cognitive benefits and (b) are "Made in the USA" and/or "Manufactured in the USA" using domestic ingredients and components.

233.   Plaintiffs could not have reasonably avoided the resulting injury.

234.   Plaintiffs reserve the right to allege additional conduct that constitutes further unfair business acts or practices.

//

### C. *"Fraudulent" Prong*

235. Defendants violated the "fraudulent" prong of the UCL by misleading Plaintiffs and the Class to believe that the Class Products (a) provide cognitive benefits and (b) are "Made in the USA" and/or "Manufactured in the USA."

236. The Class Products were falsely marketed as providing cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus," when, in fact, they lack the necessary nootropic ingredients required to produce the advertised cognitive or energy effects. As a result of Defendants' false, deceptive, and misleading marketing, Plaintiffs and Class Members were misled into purchasing products that did not perform as advertised.

237. When Plaintiff Gianne browsed the Amazon.com webpage for the "LMNT Zero Sugar Electrolytes – Raspberry Salt | Drink Mix | 30-Count" on December 9, 2023, she reviewed language stating "FEEL THE DIFFERENCE: All-day energy starts with optimal hydration. More energy. No brain fog or cramps. You feel the difference when you get it right," which appeared under the "About this item" section of that page.

238. Similarly, marketing images of the Class Products, including the Products, displayed on Amazon, prominently featured the claim "FEEL THE DIFFERENCE. *All-day energy* starts with optimal hydration. *More energy*. *No brain fog* or cramps. You feel the difference when you get it right" (emphasis added), which Plaintiff Gianne saw, read, and relied upon.

239. The Class Products are also falsely represented as "Made in the USA" and "Manufactured in the USA" without clear and adequate qualification, despite containing foreign sourced, grown or manufactured ingredients and/or components.

240. When Plaintiff Gianne browsed the Amazon.com webpage for the "LMNT Zero Sugar Electrolytes – Raspberry Salt | Drink Mix | 30-Count" on December 9, 2023, she reviewed one of the product's images on Amazon.com, which

prominently portrayed iconography of the American flag with the words "MADE IN THE USA."

241.   Relying on the foregoing misrepresentations, Plaintiff Gianne purchased the "LMNT Zero Sugar Electrolytes – Raspberry Salt | Drink Mix | 30-Count" for $45.00, exclusive of taxes and shipping, from Amazon.com.

242.   On January 31, 2025, Plaintiff Gianne encountered a similar misrepresentation on a single stick pack of the "LMNT Zero Sugar Electrolytes – Citrus Salt | Drink Mix," available for individual purchase, at Perspire Sauna Studio in Santa Monica, California. Relying on Defendants' representations (including previous representations) that the Product offered cognitive benefits and was of domestic origin, such as Defendants' representation on the back of the single stick product's packaging that it was "MANUFACTURED IN THE USA," Plaintiff Gianne purchased a single stick pack of the "LMNT Zero Sugar Electrolytes – Citrus Salt | Drink Mix" for $4.00, not including taxes, for her personal use.

243.   Similarly, on January 18, 2024, while visiting Defendants' website, Plaintiff Powell came across a webpage for Defendants' "LMNT INSIDER Bundle," which allows a customer to choose three (3) 30-count boxes of different single stick packs along with a bonus item. While reviewing that webpage, Plaintiff Powell came across pictures of the ingredient panel for each flavor of the Product, including the Grapefruit Salt, Citrus Salt, and Raspberry Salt flavors, which indicated that the Products were all "Manufactured in the USA." Relying on this representation, Plaintiff Powell purchased the "LMNT INSIDER Bundle," which included three (3) 30-count boxes of the Product (Grapefruit Salt, Citrus Salt, and Raspberry Salt) for $135.00, exclusive of tax and shipping, for her personal use. As part of her purchase, Plaintiff Powell also received the Chocolate Caramel flavor of the Product as a bonus item.

244.   Like Plaintiffs, Class members purchased the Class Products in reliance on Defendants' misrepresentations, as reasonable consumers would.

245.   Plaintiffs and the Class are not sophisticated experts in consumer product marketing practices, product labeling, ingredient benefits or sourcing, or the regulations governing products such as the Class Products.

246.   Plaintiffs and members of the putative Class acted reasonably in purchasing the Class Products based on their belief that Defendants' representations were accurate, truthful and lawful.

247.   Plaintiffs reserve the right to allege additional conduct that constitutes further fraudulent business acts or practices.

### D. *"Unfair, Deceptive, Untrue or Misleading Advertising" Prong*

248.   Defendants' labeling, marketing, and advertising is unfair, deceptive, untrue, and misleading, as it misleads consumers into believing that the Class Products (a) provide cognitive benefits when they do not; and (b) are "Made in the USA" and/or "Manufactured in the USA," despite being made with foreign-sourced ingredients and components.

249.   Plaintiffs, as reasonable consumers, and the general public were likely to be, and in fact were, deceived and misled by Defendants' labeling and marketing. They reasonably interpreted Defendants' representations according to their plain and ordinary meaning—that the Class Products (a) provide cognitive benefits and (b) are "Made in the USA" and/or "Manufactured in the USA," meaning that they are made with domestic ingredients and components.

250.   Plaintiffs and the Class are not sophisticated experts in consumer product marketing practices, product labeling, ingredient benefits or sourcing, or regulations governing the Class Products. They acted reasonably in purchasing the Class Products based on their belief that Defendants' representations were accurate, truthful and lawful.

251.   Plaintiffs and the Class lost money or property as a result of Defendants' UCL violations because, at a minimum: (a) they would not have purchased the Class Products on the same terms had they known the true facts about Defendants'

representations; (b) they paid a price premium for the Class Products due to Defendants' alleged misrepresentations; and/or (c) they chose Class Products over the products of Defendants' competitors who made accurate, truthful and lawful representations about their products.

252.    Defendants' alleged unlawful, unfair, and deceptive business practices, along with their unfair, deceptive, untrue, or misleading advertising, present a continuing threat to the public as Defendants and their agents continue to engage in unlawful conduct that harms consumers.

253.    Such acts and omissions by Defendants are unlawful, unfair, and/or deceptive, constituting violations of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Plaintiffs reserve the right to identify additional violations by Defendants as may be uncovered through discovery.

254.    As a direct and proximate result of the acts and representations described above, Defendants have received and continue to receive unearned commercial benefits at the expense of their competitors and the public.

255.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct described herein, Defendants have been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiffs, who unwittingly provided money based on Defendants' misrepresentations.

256.    Plaintiffs were harmed because Defendants received Plaintiffs' money through unlawful, false, unfair, and deceptive representations made regarding the Class Products.

257.    Defendants' conduct, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to California's Business and Professions Code. Unless enjoined by the court, Defendants will retain the ability to, and may, continue to engage in unfair and deceptive competition and misleading marketing. As a result, Plaintiffs and the Class are entitled to both injunctive and monetary relief.

258.   Plaintiffs would like to purchase the Class Products again but cannot be certain they will not be misled in the future unless and until Defendants make appropriate changes to the labeling and marketing of their Class Products, as requested herein.

259.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the proposed Class are entitled to, and hereby seek, injunctive relief to prevent Defendants from continuing the conduct in question. Additionally, Plaintiffs seek public injunctive relief to prevent Defendants from marketing and selling products as (a) providing cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus" and (b) being "Made in the USA" and/or "Manufactured in the USA" (or similar language) without clear and proper qualification of the foreign ingredients and components contained therein.

260.   In prosecuting this action to enforce important rights affecting the public interest, Plaintiffs seek the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

### THIRD CAUSE OF ACTION
**Violations of California's False Advertising Law ("FAL")**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

261.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

262.   California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, states that "[i]t is unlawful for any ... corporation ... with  intent … to dispose  of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatsoever, including over the Internet, any statement...which is untrue

or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading....”

263.   Defendants' material misrepresentations and omissions, as alleged herein, violate Cal. Bus. & Prof. Code §§ 17500, *et seq*. Defendants knew or should have known that these misrepresentations and omissions were false, unlawful, unfair, deceptive, and misleading. This includes, but is not limited to, the representations that (a) the Class Products provide cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus" and (b) the Class Products are "Made in the USA" and/or "Manufactured in the USA" despite containing foreign-grown, sourced, or manufactured ingredients and components.

264.   Plaintiffs and the Class suffered tangible, concrete injuries as a result of Defendants' actions, as set forth herein, because they purchased the Class Products in reliance on Defendants' misrepresentations.

265.   As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and Class members are entitled to injunctive relief, equitable relief, and restitution.

266.   Plaintiffs and the Class seek an order requiring Defendants to disclose the misrepresentations and request an order awarding Plaintiffs restitution for the money wrongfully acquired by Defendants through those misrepresentations.

267.   Plaintiffs and the Class seek an order requiring Defendants to pay attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

**FOURTH CAUSE OF ACTION**
**Intentional Misrepresentation**

268.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

269.   Defendants knowingly and intentionally represented to the public, including Plaintiffs and the Class, through their marketing, advertising, labeling, and other means, that (a) the Class Products provide cognitive benefits and (b) are "Made in

the USA" and/or "Manufactured in the USA" without any qualification of foreign ingredients and components contained therein. These representations are unfair, deceptive, false and misleading because (a) the Class Products lack the necessary nootropic ingredients required to produce the advertised cognitive effects and (b) the Class Products contain multiple ingredients and components that are sourced from outside the United States.

270.   Defendants knew their representations were false because they maintain full control over the formulation and manufacturing of the Class Products.

271.   Defendants acted intentionally by willfully and purposefully disseminating misrepresentations about the Class Products through labeling as well as online and offline marketing, advertising, and social media.

272.   However, as described above, Defendants' representations regarding the Class Products are false, unlawful, unfair, deceptive and/or misleading.

273.   Defendants knew their representations regarding the Class Products were false, unlawful, unfair, deceptive, and/or misleading, yet continued to make such representations over a period of years.

274.   Defendants further knew that their agents and retailers were marketing the Class Products in a false or misleading manner, as Defendants together designed, manufactured, and affixed the product labeling to the Class Products before supplying them to retailers. Additionally, Defendants provided their agents and retailers with marketing materials that contained their false and misleading representations, thereby perpetuating the deception.

275.   Plaintiffs and the putative Class members saw, believed, and relied on Defendants' misrepresentations when deciding to purchase the Class Products.

276.   As a direct and proximate result of Defendants' intentional misrepresentations described above, Plaintiffs and the putative Class suffered damages in an amount to be determined at trial.

277.   By engaging in the acts described above, Plaintiffs and the putative Class are entitled to recover exemplary or punitive damages.

## FIFTH CAUSE OF ACTION
### Breach of Express Warranty

278.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

279.   Defendants represented to Plaintiffs and similarly situated consumers, through their labeling, advertising, and marketing, that (a) the Class Products provide cognitive benefits - such as relief from "brain fog" and enhanced or sustained "focus" - when, in fact, they do not; and (b) the Class Products are "Made in the USA" and/or "Manufactured in the USA" without any qualification or disclosure of the inclusion of foreign ingredients and components.

280.   Defendants' representations regarding the Class Products' nootropic benefits and unqualified domestic origin claims constitute affirmations of fact.

281.   Defendants' explicit claims that the Class Products provide cognitive benefits, as well as Defendants' unqualified representations that the Class Products are "Made in the USA" and/or "Manufactured in the USA," directly pertain to the efficacy, nature and composition of the products. These representations form a fundamental part of the bargain between Defendants and purchasers, influencing consumer purchasing decisions and expectations.

282.   Defendants' statements—prominently featured on the labeling and marketing of the Class Products—constitute express warranties regarding the benefits, nature, composition, and origin of the products and their ingredients.

283.   Relying on these express warranties, Plaintiffs and Class members purchased the Class Products, believing these warranties.

284.   Defendants breached their express warranties by falsely representing that the Class Products provide cognitive benefits when, in fact, they do not. Additionally,

Defendants breached their express warranties by representing that the Class Products were "Made in the USA" and/or "Manufactured in the USA," without qualification, when, in reality, they contained foreign-sourced ingredients.

285.    As a result of Defendants' breach, Plaintiffs and Class members suffered harm and are entitled to recover either the full purchase price of the Class Products or the difference between their actual value and the value they would have held had Defendants' representations regarding the Class Products been accurate, truthful, and lawful.

286.    Plaintiffs and Class members did not receive the benefit of their bargain and sustained additional injuries, as alleged herein.

287.    Had Plaintiffs and Class members known the true nature, benefits and origin of the ingredients of the Class Products, they either would not have purchased the products or would not have paid the price Defendants charged.

288.    Defendants' misrepresentations were a substantial factor in causing Plaintiffs and the Class economic harm.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**

289.    Plaintiffs plead this unjust enrichment cause of action in the alternative to contract-based claims.

290.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, and further allege as follows:

291.    Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

292.    Plaintiffs and members of the Class conferred non-gratuitous benefits upon Defendants by purchasing the Class Products, which Defendants misrepresented as to their benefits, and origin.

293. Plaintiffs and Class members allege that Defendants owe them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

294. An undue advantage was taken of Plaintiffs' and the Class's lack of knowledge of the deception, resulting in money being extracted to which Defendants had no legal right.

295. Defendants are therefore indebted to Plaintiffs and members of the Class in a specific sum—the amount of money each paid for the Class Products, which Defendants should not retain in equity and good conscience.

296. Defendants are therefore liable to Plaintiffs and members of the Class for the amount of unjust enrichment.

297. Defendants' retention of any benefit, whether directly or indirectly collected from Plaintiffs and members of the Class, violates principles of justice, equity, and good conscience.

298. As a result, Defendants have been and continue to be unjustly enriched.

299. Plaintiffs and the Class are entitled to recover from Defendants all amounts Defendants have wrongfully and improperly obtained, and Defendants should be required to disgorge to Plaintiffs and the Class benefits they have unjustly received.

300. Defendants accepted and retained such benefits with knowledge that Plaintiffs' and Class members' rights were being violated for financial gain. Defendants have been unjustly enriched by retaining the revenues and profits obtained from Plaintiffs and Class members, and such retention under these circumstances is both unjust and inequitable.

301. As a direct and proximate result of Defendants' unlawful practices and the retention of monies paid by Plaintiffs and the Class, Plaintiffs and the Class have suffered concrete harm and injury.

302. Defendants' retention of the non-gratuitous benefits conferred upon them by Plaintiffs and the Class would be unjust and inequitable.

303.   Plaintiffs and members of the Class are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendants, in a manner to be determined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, and each of them, as follows, seeking equitable relief in the alternative to legal relief:

- Certification of this action as a class action;
- Appointment of Plaintiffs as Class Representatives;
- Appointment of Plaintiffs' attorneys as Class Counsel;
- That Defendants' wrongful conduct alleged herein be adjudged and decreed to violate the consumer protection statutes asserted herein;
- An Order declaring that Defendants' conduct violated the CLRA, Cal. Civ. Code §§ 1750, *et seq.*, and awarding injunctive relief pursuant to Cal. Civ. Code § 1780(a) and (b);
- An Order declaring that Defendants' conduct violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and awarding injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203;
- An Order requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;
- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendants' ill-gotten gains, compelling Defendants to pay restitution to Plaintiffs and all members of the Class, and to restore to Plaintiffs and Class members all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;
- For pre and post-judgment interest on all amounts awarded;

- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Cal. Bus. & Prof. Code § 17535 and/or Cal. Bus. & Prof. Code § 17203;

- Actual damages under Cal. Civ. Code § 1780(a);

- For public injunctive relief as pleaded or as the Court may deem proper;

- That Defendants be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;

- Punitive damages including under Cal. Civ. Code § 1780(a) and/or Cal. Civ. Code § 3294;

- General and compensatory damages in an amount to be determined at trial;

- That Plaintiffs and each of the other members of the Class recover their costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5 and Cal. Civ. Code § 1780; and

- That Plaintiffs and the members of the Class be granted any other relief the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

304. Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.


Dated: March 10, 2026                     Respectfully submitted,

                                          **KAZEROUNI LAW GROUP, APC**

                                          By:  _/s/ *Abbas Kazerounian*___
                                               Abbas Kazerounian, Esq.
                                               *ATTORNEYS FOR PLAINTIFFS*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**Additional Plaintiffs's Counsel**</u>
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, UT 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523